IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 12, 2005 Session

## KEVIN ALLEN KYLE v. MARY LOU CLIMER KYLE

**A Direct Appeal from the Chancery Court for Henderson County**
**No. 15639      The Honorable Ron E. Harmon, Chancellor**

---

**No. W2004-01221-COA-R3-CV - Filed February 10, 2005**

---

Wife appeals from trial court's division of marital property and award of alimony in divorce proceeding. Wife contends the trial court made numerous errors in the classification and division of various assets and in the alimony award.  Husband contends that the trial court did not err in its division of marital property, contends that Wife can be rehabilitated, and seeks an award of rehabilitative alimony to terminate at a specific date. Husband further contends that trial court erred in awarding attorney's fees to Wife, and Husband seeks attorney's fees and costs related to defending this appeal. We affirm in part, reverse in part, modify in part and remand.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY M. KIRBY, J., joined.

Michael B. McWherter of Jackson for Appellant, Mary Lou Climer Kyle

Mary Jo Middlebrooks and Betty Stafford Scott of Jackson for Appellee, Kevin Allen Kyle

### OPINION

This is an appeal from an Order for Absolute Divorce. Appellant, Mary Lou Climer Kyle ("Ms. Kyle"), appeals from the chancery court's Order on numerous grounds relating to the division of marital property and the award of alimony. Appellee, Kevin Allen Kyle ("Mr. Kyle"), contends that the division of property was correct but that the trial court erred in its award of alimony. We conclude that the trial court did err in making the division of marital property, but that the trial court's judgment was correct in all other respects.

### I. PROCEDURAL HISTORY

Kevin Allen Kyle filed a Complaint for Divorce on January 7, 2002. Ms. Kyle filed an Answer and Counter-Complaint on April 16, 2002, and she filed a Motion for Alimony Pendente Lite on April 9, 2002. After a hearing on her Motion for Alimony Pendente Lite, she was awarded $1,800 per month as alimony pendente lite. The final divorce hearing was held on October 3, 2002, and the trial court entered an Order of Absolute Divorce on January 23, 2003.

Wife timely filed her notice of appeal on February 17, 2004.

## II. FACTS

Mary Lou Climer Kyle and Kevin Allen Kyle were married on June 11, 1970. They had one child, Berek Kyle, who committed suicide in the marital residence on March 3, 1997. Mr. and Ms. Kyle separated in July of 2001.

Both Ms. Kyle and Mr. Kyle testified that their marriage had been a good one for most of its thirty-two year duration. They were both ambitious and hardworking and enjoyed professional success in their respective careers. Mr. Kyle was employed for the entire duration of their marriage by Magnetech (later acquired by Emerson Electronics). In the early nineties his company entered into a joint venture with a Chinese company, an arrangement that required Mr. Kyle to travel to China, sometimes for weeks at a time, on a regular basis. As Director of Technology Transfer, Mr. Kyle was responsible for integrating technology that had been used in the United States into manufacturing plant operations in foreign countries. Mr. Kyle was also required to travel to Budapest, Hungary as part of another joint venture. In 2001, Mr. Kyle had a gross income of $77,000.

At the time of their wedding, Ms. Kyle was employed as an office worker with the Grinnell Corporation in Henderson, Tennessee. In the course of her career Ms. Kyle earned an associate's degree and bachelor's degrees by attending school at night. She later held positions with an automobile dealership, as a social worker, as director of a chamber of commerce, and as the vice president of marketing at a bank. Although Ms. Kyle worked for some time after Berek's death, she soon began to suffer from agoraphobia and a lack of energy and left her position at the bank in 1998. In her last year of work at the bank, Ms. Kyle had an income of $40,000.

After the death of their son, the Kyles' relationship began to deteriorate; Mr. Kyle testified that in the wake of Berek's death, Mr. Kyle and Ms. Kyle were rarely intimate and slept in separate bedrooms, and that Ms. Kyle became preoccupied with the possibility of contacting their dead son through the use of spiritual mediums and psychics. Ms. Kyle attempted to start a home-based business providing grief counseling for people who had lost loved ones, which was not successful.

In July of 2001, the Kyles separated, and on January 7, 2002 Mr. Kyle filed for divorce. The trial court awarded Ms. Kyle $1,800 per month as alimony pendente lite. Because Mr. Kyle was also paying Ms. Kyle's homeowner's and medical insurance, Mr. Kyle deducted the amount of these insurance premiums from the $1,800 he was ordered to pay Ms. Kyle each month while the divorce

action was pending. The final divorce hearing was held on October 3, 2002, and the trial court entered an Order of Absolute Divorce on January 23, 2003, which provides, in pertinent part:

IT IS THEREFORE ORDERED:

1.      That Wife is granted an Absolute Divorce on the grounds of inappropriate marital conduct.

2.      That Husband shall be awarded the 2001 Chrysler 300M, 1985 Chevrolet C10 Silverado, 401(k) (his), IRA (his), AARP, Fidelity Funds, Magnetek retirement (defined benefit plan), Union Planters checking account (his), First Bank savings account, one-half (1/2) of Certificate of Deposit, golf cart, and household furnishings as awarded to Husband on "Exhibit A." All title and interest of Wife in personal property listed in this paragraph is divested out of Wife and vested in Husband. That Wife and all persons claiming by, through, or under Wife are forever enjoined from executing any right, title, interest, claim or demand of any nature whatsoever in, to, or against the aforesaid property or any part thereof.

3.      That Wife shall be awarded the house & lot located at 312 Eastern Shores Drive, Lexington, Henderson County, Tennessee; 1990 BMW; IRA (hers); Roth IRA (hers); First Bank business account; First Bank checking account; First Bank MMDA account; First Bank Berek Kyle Foundation Account; one-half (1/2) of Certificate of Deposit; and the household furnishings as awarded to Wife on "Exhibit A." All title and interest of Husband therein is divested out of Husband and is vested in Wife. That Husband and all persons claiming by, through, or under Husband are forever enjoined from executing any right, title, interest, claim or demand of any nature whatsoever in, to, or against the aforesaid property or any part thereof.

4.      That Husband shall pay to Wife the sum of $30,000.00 in certified funds, as a division of the marital property. Said sum shall be paid to Wife within thirty (30) days of entry of this Order.

5.      That Husband shall pay to Wife, directly, in advance, as alimony in futuro, the sum of $1,000.00 per month, beginning December 1, 2002, pending further Orders of this Court.

6.      That Husband shall pay as alimony in solido, the sum of $9,000.00 toward Wife's attorney fees, to Wife's attorney of record, Stephen M. Milam, within thirty (30) days of entry of this Order. Execution may issue upon the request of either Wife or her attorney.

7.      That Husband is ordered to pay the costs of this cause, for which execution may issue.

## III. ISSUES

Ms. Kyle presents the following issues for review on appeal:

*Issue 1:*    **Did the trial court err in its classification, valuation and/or division of the parties' marital and separate property?**

    **a.**    **Household furnishing and items incorrectly classified, valued, and divided.**

    **b.**    **Wife's Fidelity Account ($13,000.00) and Certificate of Deposit ($10,000.00) incorrectly classified as marital property and incorrectly divided.**

    **c.**    **Husband's MagneTek Retirement Plan and Emerson retirement benefits were not equitably divided.**

    **d.**    **Jewelry and bank accounts that do not exist were awarded to Wife.**

    **e.**    **Trial court incorrectly classified and divided Wife's Roth IRA as marital property.**

    **f.**    **Trial court failed to divide stock options that vested during the marriage.**

    **g.**    **Wife's automobile incorrectly classified and divided as marital property.**

*Issue 2:*    **Did the trial court err in its alimony award to Wife as follows:**

    **a.**    **By reducing, sua sponte, Wife's alimony in futuro from $1,800.00 per month to $1,000.00 per month without the showing of a decrease in Wife's need nor in husband's ability to pay?**

    **b.**    **By failing to require that Husband maintain Wife as beneficiary on his life insurance policy to secure his alimony obligation?**

    **c.**    **By failing to require that Husband maintain medical and dental insurance coverage for Wife as alimony in futuro?**

Mr. Kyle presents the following additional issues on appeal.

*Issue 3:*    **Whether the trial court erred in its award of alimony in futuro [by failing to order a date on which the alimony payments would terminate].**

*Issue 4:*    **Whether the trial court erred in its award of attorney's fees to wife.**

***Issue 5:*** **Whether this Honorable Court should award husband attorney's fees and costs incurred to defend this appeal.**

## IV. STANDARD OF REVIEW

Our standard of review in this non-jury case is de novo upon the record of the proceedings below and there is no presumption of correctness with respect to the trial court's conclusions of law. ***Campbell v. Florida Steel Corp.*, 919 S.W.2d 26 (Tenn.1996)** and Tenn. R.App. P. 13(d). The trial court's factual findings are, however, presumed to be correct and we must affirm such findings absent evidence preponderating to the contrary. ***Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87 (Tenn.1993)**. We further note that when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. ***McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn.1995)**; ***Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn.App.1997)**. The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. ***Id.***; ***In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn.1997)**. However, in reviewing documentary proof, "all impressions of weight and credibility are drawn from the contents of the evidence, and not from the appearance of witnesses and oral testimony at trial." ***Wells v. Tennessee Board of Regents*, 9 S.W.3d 779, 783-784 (Tenn.1999)**. As a result, appellate courts may make an independent assessment of the credibility of the documentary proof it reviews, without affording deference to the trial court's findings. ***See Corcoran v. Foster Auto GMC, Inc.*, 746 S.W.2d 452, 456 (Tenn.1988)**.

## V. ANALYSIS

***Issue 1:*** **Did the trial court err in its classification, valuation and/or division of the parties' marital and separate property?**

Ms. Kyle's first issue on appeal is whether the trial court erred in its classification, valuation and/or division of the parties' marital and separate private property. Ms. Kyle specifically contends that the court incorrectly valued many household furnishings, that it treated her separate property as marital property, and that it awarded property to her that was non-existent or worth vastly less than it was found to be worth by the Court.

Under Tennessee law, although there is a presumption that marital property is owned equally, there is no presumption that marital property should be divided equally. ***Bookout v. Bookout*, 954 S.W.2d 730, 731 (Tenn.Ct.App.1997)**. Thus, an equitable division of marital property need not be an equal division of the property. ***Id***. A trial court is afforded wide discretion when dividing the marital property, and its distribution will be given "great weight" on appeal. ***Ford v. Ford*, 952**

**S.W.2d 824, 825 (Tenn.Ct.App.1997)**. Guidelines for the equitable division of marital property are set forth in T.C.A. § 36-4-121(c)(Supp.2004). That statute provides, in relevant part:

> In making equitable division of marital property, the court shall consider all relevant factors including:
>
> (1) The duration of the marriage;
>
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
>
> (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
>
> (4) The relative ability of each party for future acquisitions of capital assets and income;
>
> (5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
>
> (6) The value of the separate property of each party;
>
> (7) The estate of each party at the time of marriage;
>
> (8) The economic circumstances of each party at the time the division of property is to become effective;
>
> (9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;
>
> (10) The amount of social security benefits available to each spouse; and
>
> (11) Such other factors as are necessary to consider the equities between the parties.

Having reviewed the statute governing the division of marital property, we now proceed to consider separately each of the properties at issue in this appeal.

        **a.**         **Household furnishing and items incorrectly classified, valued, and divided.**

Ms. Kyle first contends that the trial court incorrectly classified, valued, and divided the contents of the marital residence, such as furniture, fixtures, and certain appliances, resulting in an inequitable distribution of marital property. In her appeal brief, Ms. Kyle states that, "[t]he division of household furnishings is based on a division submitted by the Husband which included the Wife's separate property of furnishings as marital property." Wife directs this Court's attention to Exhibit D which she attached to her Amended Affidavit of Income, Assets, and Expenses. Although Exhibit D does include a list of property claimed by Ms. Kyle to be her separate property, she has not provided sufficient basis upon which we are able to conclude that her separate property was included in the division of household furnishings by the trial court. The list of household furnishings upon which the trial court relied in making its division of marital property was contained on a spreadsheet prepared by Mr. Kyle. The description and other identifying information for items on Mr. Kyle's list do not correspond, in any reliable or systematic way, to the descriptions of the separate property claimed by Ms. Kyle; nor has Ms. Kyle supplied us with a list of items she claims as separate property that were included in the division of household furnishings. It is not incumbent upon this Court to comb through a list of dozens of household furnishings and, through a process of guesswork and conjecture, determine whether any items included in the division of household furnishings correspond to items on her list of separate property. Therefore, we find no error in the trial court's classification of household furnishings.

We next must determine whether the trial court erred in valuing the household furnishings included in the division of marital property. Ms. Kyle asserts that the furnishings were worth much less than the trial court found them to be worth. At trial, Ms. Kyle introduced the testimony of Mr. Keith Lindsey, the manager at a furniture store, whom she retained to examine and appraise the furnishings (excluding the dishwasher, the range, and the refrigerator) . Mr. Lindsey testified that the furnishings were worth between $3,000 and $3,500. Mr. Kyle did not call any witnesses to testify as to the value of the furnishings, but in his own testimony offered the opinion that the furnishings were worth over $25,000. Mr. Kyle explained the basis for his opinion: "Some of them are antiques. Mary liked very good quality furnishings. Many of them are expensive wood furniture.... I'd put a value of like, I think, a little over $25,0000 on all the household furnishings." Under Tennessee Rule of Evidence 701, "A witness may testify to the value of the witness's own property or services."

The trial court accepted Mr. Kyle's valuation of the household furnishings. Mr. Kyle's valuation was within the range of reasonableness. We conclude that the trial court did not err in accepting Mr. Kyle's valuation of the furnishings.

Finally, Ms. Kyle contends that the trial court erred in its division of the household furnishings, since she alleged that the furnishings were incorrectly classified. We pretermit any discussion of this issue since we have determined that the trial court did not err in classifying the furnishings. The trial court did not err in its classification, valuation or division of the household furnishings.

**b.** **Wife's Fidelity Account ($13,000.00) and Certificate of Deposit ($10,000.00) incorrectly classified as marital property and incorrectly divided.**

Ms. Kyle next contends that a Fidelity investment account worth $13,000 and a certificate of deposit worth $10,000 were incorrectly classified and divided as marital property. Ms. Kyle claims that the funds in the Fidelity investment account were a gift to her from her mother, and therefore constitute separate property. She further contends that the certificate of deposit is her separate property.

We first consider the Fidelity investment account. At trial, Ms. Kyle testified that her mother "got obsessed about having to go to the nursing home, and she was afraid they would get all of her money." In order to prevent the nursing home from draining her wealth, Ms. Kyle testified, her mother gave her $10,000 and she placed it in a separate account:

> I told her I – you know, she talked to me about it, about why she was doing it. And I said, yes, I'll take it, and I will – we will keep it in a separate account, and if you ever need it, you ask for it. And if you don't ask for it, and – and you haven't needed it by the time Berek goes to college, we will use it for his college education.

Berek committed suicide before he had the opportunity to go to college. Ms. Kyle next testified about what happened to the money received from her mother after Berek's death:

> [S]ometime shortly after Berek's suicide, I ... realized that ... we had had ... I had had that money in a separate account, and then I realized that Kevin moved some money in that account that was ours and made it a joint account without my knowledge or permission. And when I found out about it, I talked to my mother about it, and she was very upset.

Mr. Kyle offered a somewhat different account of how this money ended up in a joint account:

> [Ms. Kyle's mother] gave us $10,000 to put in – for Berek's college education. I invested this in Berek's name with the stewardship being me and Mary and put it in his Social Security number. I have the records at home showing what account they were, if I could ever get access to those records, and I could show the Court how it was put in his name, his account, his Social Security number; and then, of course, after Berek's death we couldn't keep it in his name. So then I moved it into our joint Fidelity account.

Upon review of the testimony of Ms. and Mr. Kyle, we conclude that the evidence does not preponderate against a finding that the funds contained in the account were intended by Ms. Kyle as a gift to both Mr. and Ms. Kyle. Ms. Kyle's testimony that she and her mother agreed that the funds would be used for Berek's college education if Ms. Kyle's mother did not ask for the money to be returned supports a finding that the funds were intended as a gift to the Kyle family, not solely to Ms. Kyle. The trial court did not err in classifying and dividing this Fidelity investment account as marital property.

We next consider the classification and division of the $10,000 certificate of deposit that Ms. Kyle contends is her separate property. Ms. Kyle, in her appeal brief, states that "[t]he CD originated with monies belonging to Wife's mother and is titled in the name of Wife and Wife's mother." However, Ms. Kyle directs us to no testimony supporting her claim about the origin of the certificate of deposit nor does she direct our attention to any exhibits in the record supporting this contention. Although it is not incumbent upon us to comb through the record in search of support for her claims, our review of the transcript found no testimony whatsoever by Ms. Kyle concerning the certificate of deposit. Mr. Kyle did testify concerning the certificate of deposit; he stated that Ms. Kyle had incorrectly omitted the certificate of deposit from her proposed division of marital assets.

Q. ... Now, did you also notice on the documents that she submitted to the Court that there were certain assets that were missing?

A. Yes, ma'am.

Q. And one was a CD?

A. Yes, ma'am.

***

Q. So it's a $10,000 certificate of deposit?

A. That's what it was when it was originally invested. It's probably more than that now.

***

Q. Okay. Do you know why that's missing from her proposal?

A. No, ma'am.

In her appeal brief, Ms. Kyle claims that Mr. Kyle conceded in his proposed division of assets that the certificate of deposit was Ms. Kyle's separate property. She states:

[I]n Husband's proposed division of assets, this Certificate of Deposit was listed as Wife's separate property, Husband did not even ask for a division of this asset, acknowledging that this asset is the separate property of Wife.

This statement mischaracterizes the record. In fact, Mr. Kyle submitted two proposed divisions of assets, one reflecting a sale of the marital home and division of the proceeds, and a second one reflecting the award of the marital home to Ms. Kyle. In neither of those proposals did Mr. Kyle concede that the certificate of deposit was Ms. Kyle's separate property. On one of the proposals he

did propose awarding the entire certificate of deposit to Ms. Kyle, but such award was to be offset by the award of other property to him. We conclude that the trial court did not err in classifying the certificate of deposit as a marital asset and dividing it accordingly.

### c.   Husband's MagneTek Retirement Plan and Emerson retirement benefits were not equitably divided.

Ms. Kyle's next issue on appeal concerns Mr. Kyle's Magnetek defined benefit retirement plan.[1] She alleges that the trial court erred in failing to include this retirement plan in the division of marital property. On both versions of his proposed division of marital property, Mr. Kyle listed the Magnetek retirement fund in the column with other property he proposed to be awarded to him, but without assigning a value to it. Instead, at the bottom of each version of the proposal sheet is a note that states, "Defined benefit plan - Monthly benefit to be equally divided as received." In testimony at trial Mr. Kyle stated that he was not sure what the amount of the monthly benefit from would be, but he stated that he expected Ms. Kyle to receive half of this monthly benefit:

> Q.   [T]hat's ... your proposal that whatever it is at the time you retire, then she would receive half of that benefit?
> A.   I think that's only fair, yes.

Ms. Kyle introduced evidence that the Magnetek defined benefit retirement plan had a value of $57,828.17 at the time of Mr. Kyle's termination of employment with Magnetek.

The trial court's findings making the distribution of marital property is almost identical to the version of Mr. Kyle's proposed division of marital property in which Ms. Kyle is awarded the marital home. In those findings, Mr. Kyle is awarded the Magnetek defined benefit retirement plan. However, the trial court made no finding awarding Ms. Kyle half of the monthly benefit. One respect in which the trial court's division of marital property differs from Mr. Kyle's proposed division of marital property is in awarding Ms. Kyle a cash payment of $30,000, which is approximately half of the value of the Magnetek defined benefit retirement plan. We recognize that the trial court may have intended the $30,000 payment to reflect Ms. Kyle's share of the Magnetek retirement plan, but it is not clear that this was the trial court's intention. Therefore we must remand this issue to the trial court for a determination of whether the division of marital property must be adjusted to give Ms. Kyle an equitable share of the Magnetek defined benefit retirement plan.

Ms. Kyle next contends that the trial court erred in failing to include Mr. Kyle's Emerson Electric retirement plan in the distribution of marital property. Ms. Kyle introduced evidence that Mr. Kyle's projected monthly benefit from the Emerson Electric retirement plan was $223.38 per month. Mr. Kyle did not include the Emerson Electric retirement plan in either version of his proposed division of marital property. At trial Mr. Kyle admitted he knew that he had this retirement

---

[1]   At some point prior to the divorce trial, Magnetek was sold to Emerson Electric. As a result of this sale, Mr. Kyle had retirement plans at both Magnetek and Emerson Electric.

account but denied ever receiving a statement of the value of the plan or the amount of his projected monthly benefit. We conclude that the trial court erred in failing to include this retirement plan in the distribution of marital property, and we remand to the trial court for further proceedings concerning how to effectuate the equitable division of this asset consistent with our conclusion that it must be divided as marital property.

### d. Jewelry and bank accounts that do not exist were awarded to Wife.

Ms. Kyle next contends that the trial court erred in overvaluing jewelry that was awarded to her with the result that the division of marital property was inequitable, and that the trial court erroneously awarded bank accounts to her that do not exist.

Mr. Kyle did not testify about the jewelry, but he contended on the spreadsheet attached to his proposed division of marital property that Ms. Kyle was in possession of women's jewelry worth $4,000. Ms. Kyle testified that Mr. Kyle was incorrect in claiming that she had such jewelry:

Q.   ... Mr. Kyle has listed $4,000 in assets of jewelry that you have. Does that exist?
A.   No.
Q.   How much gold or precious stones or silver jewelry do you have?
A.   None.

In her appeal brief, Ms. Kyle states, "This testimony was uncontroverted by Husband at trial and Wife can only surmise that Husband has mistaken what is commonly known as 'costume jewelry' for 'precious or semi-precious jewelry.'" In view of the fact that there was no testimony concerning the jewelry other than Ms. Kyle's, and Mr. Kyle provided no basis for his assertion that the jewelry was worth $4,000, we conclude that the trial court erred in valuing the jewelry at $4,000. We believe that the evidence preponderates in favor of a finding that Ms. Kyle possessed no jewelry of any value. Therefore, we modify the trial court's award of marital property so that Ms. Kyle receives an additional payment of $4,000 to offset the trial court's erroneous award of $4,000 of jewelry to her.

Ms. Kyle next alleges that the trial court erroneously awarded her several First Bank accounts that do not exist: a First Bank business account, a First Bank checking account, and a First Bank MMDA account. In her appeal brief, Ms. Kyle states that "the trial court awarded Wife these assets without engaging in the required classification and valuation of these assets." Upon review of Mr. Kyle's proposed division of marital assets, we note that while Mr. Kyle included the accounts in the column of assets to be awarded to Ms. Kyle, he attached no value to the First Bank business account and the First Bank MMDA account, and he attached a value of $2,000 to the First Bank checking account. The court, which seemed largely to adopt Mr. Kyle's proposed division of marital assets, followed Mr. Kyle's proposal in awarding the accounts to Ms. Kyle. Because Mr. Kyle had attached no value to two of the three accounts at issue here, the total value of these accounts was $2,000 (reflecting the value of the checking account). Accepting the values contained in Mr. Kyle's proposal

adopted by the trial court, property with the value of $234,191 was awarded to Ms. Kyle and property with the value of $233,942 was awarded to Mr. Kyle.

Ms. Kyle testified at trial that the First Bank accounts did not exist, and stated that she possessed a letter from the bank supporting this assertion. However, this letter was not introduced into evidence. Mr. Kyle did not testify concerning the accounts. Because the court apparently attached no value to the First Bank business account and the First Bank MMDA account, they were not included in the value of property awarded to Ms. Kyle and Mr. Kyle. This leaves at issue only the First Bank checking account. Because Ms. Kyle testified that this account did not exist and Mr. Kyle did not testify at all concerning this account, we conclude that the evidence preponderates against the trial court's finding that this account existed as marital property. We must reverse the trial court's inclusion of this account in the property awarded to Ms. Kyle, and the trial court's judgment is modified to award her an additional payment of $2000 in place of this account.

e.     **Trial court incorrectly classified and divided Wife's Roth IRA as marital property.**

Ms. Kyle's next issue on appeal concerns the trial court's classification and division of Ms. Kyle's Roth IRA as marital property. At trial, Ms. Kyle testified that the Roth IRA was funded with life insurance proceeds following the death of her father:

> Q.     Mr. Kyle has listed as joint property a $2,500 Roth IRA. Where did that money come from?
> A.     It was from an insurance policy that my father left for me that he took out when I was born, and it became mine when he passed away.

This testimony was uncontested by Mr. Kyle in his own testimony. We conclude that the evidence at trial preponderates against the trial court's finding that the Roth IRA was marital property, and therefore the court erred in counting this Roth IRA as part of the marital property awarded to Ms. Kyle. The trial court's judgment in this regard is reversed, and the judgement is modified to award Ms. Kyle an additional $2,500 in place of this Roth IRA.

f.     **Trial court failed to divide stock options that vested during the marriage.**

Ms. Kyle contends that the trial court erred in failing to classify and divide as marital property the stock options earned by Mr. Kyle in the course of his employment with Emerson Electric. Under Tennessee Code Annotated § 36-4-121, stock options acquired during marriage—whether vested or unvested—constitute marital property:

> "Marital property" includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation, and the value of vested and unvested pension, vested and unvested

-12-

stock option rights, retirement or other fringe benefit rights relating to employment that accrued during the period of the marriage.

With respect to Mr. Kyle's stock options, neither party testified concerning these options. Mr. Kyle did not include these options in his proposed division of marital assets. However, Ms. Kyle did attach documentation concerning these options to her proposed division of marital assets, and submitted documentation establishing that Mr. Kyle's options had fully vested by the time of the divorce proceedings. In her appeal brief, Ms. Kyle states:

An option for 500 shares vested Oct. 4, 2000, an option for 500 shares vested Oct. 4, 2001, and an option for 167 shares vested Oct. 6, 2001, a total of 1166 shares [*sic*]. The trial of the matter occurred Oct. 3, 2002, therefore these assets should have been divided. Wife asks that she be awarded an interest in one-half (½) of 583 shares of these options.

Upon review of the record, this Court concludes that Ms. Kyle's description of the stock options in her appeal brief may be in error. The documentation submitted with her proposed division of marital property suggests that Mr. Kyle may have acquired more than 1167 options by the time of the divorce action. Ms. Kyle submitted a document, the source of which is unspecified, stating as follows:

Emerson Stock Options
| Option date | 10/04/1999 | 1500 Shares | Price $64,062.5 |
| Full Vested | 10/04/2000 | 500 Shares | |
| Full Vested | 10/04/2001 | 500 Shares | |
| Full Vested | 10/04/2002 | 500 Shares | |

Emerson Stock Options
| Option date | 10/06/2000 | 500 Shares | Price $42,562.5 |
| Full Vested | 10/06/2001 | 166 Shares | |
| Full Vested | 10/06/2002 | 167 Shares | |
| Full Vested | 10/06/2003 | 167 Shares | |

We interpret this document to mean that Mr. Kyle owned 2000 fully vested options for Emerson Electric stock as of October 6, 2003. This document appears to suggest that Mr. Kyle was awarded 1500 Emerson stock options on October 4, 1999, which vested in 500-share increments in each of the three succeeding years. The document also appears to suggest that Mr. Kyle was awarded 500 Emerson stock options on October 6, 2000, 166 shares of which vested on October 6, 2001, 167 shares of which vested on October 6, 2002, and 167 shares of which vested on October 6, 2003.

If we are correct in reaching the tentative conclusion that Mr. Kyle was awarded 2000, not 1167, stock options in Emerson Electric, these options must be classified as marital property, since these options were acquired during the course of the Kyle marriage.

However, we are unable to resolve this issue on the record as it has been presented to us, since the source of the document we relied upon in making this surmise is unclear. We will remand this issue to the trial court, which must hold further proceedings to, first, determine how many options were acquired by Mr. Kyle during the marriage, and second, to determine how the value of these options can be divided equitably between the parties.

### g. Wife's automobile incorrectly classified and divided as marital property.

Ms. Kyle contends that the trial court erred in classifying her BMW automobile as marital property and including it in the division of marital property. Ms. Kyle claims that her mother purchased the BMW for her alone, and that it therefore constitutes separate property. Mr. Kyle, on the other hand, contends that Ms. Kyle's mother purchased the BMW as a gift for both of them, and that it is therefore marital property to be distributed accordingly.

At trial Ms. Kyle testified as follows concerning the BMW:

Q.  ... Who paid for that 12-year-old car you're driving?
A.  My mother gave it to me.
Q.  Now, in his —
A.  And Kevin didn't even know that she was giving it to me until I had already had made that arrangement with my mother.

Ms. Kyle later admitted, under cross-examination, that she did not remember in whose name the car was titled. At trial Mr. Kyle testified as follows:

Q.  And also there's a car missing —
A.  Yes.
Q.  — from hers, and that's a 1990 BMW?
A.  Yes, ma'am.
Q.  Is that her car?
A.  She typically drove it, but it was titled jointly.
Q.  Oh, I'm sorry. That's what I meant. It was — it was the one that she drove routinely?
A.  Yes, uh-huh.
Q.  And you don't know why that's missing?
A.  Her mother, I think back in 1995 or -6, gave us several thousand dollars to buy that car, and she gave it to us for her to buy a car, and then we titled it jointly.
Q.  It was not just a gift to her?
A.  No.

We conclude that the evidence does not preponderate against the trial court's classification of the BMW automobile as marital property, and including it in the division of marital property.

*Issue 2:* **Did the trial court err in its alimony award to Wife as follows:**

      **a.** **By reducing, sua sponte, Wife's alimony in futuro from $1,800.00 per month to $1,000.00 per month without the showing of a decrease in Wife's need nor in husband's ability to pay?**

Ms. Kyle argues that the trial court erred in setting her alimony in futuro at $1,000 per month—$800 less than the $1,800 per month that was ordered as alimony pendente lite—without the showing of a decrease in her need or a decrease in Mr. Kyle's ability to pay. In her appeal brief, Ms. Kyle directs us to no law supporting her assertion that the trial court must show a decrease in her need or a decrease the spouse's ability to pay in order to order alimony in futuro less than the amount of alimony pendente lite that was awarded. The obligation to pay alimony pendente lite terminates with a final decree of divorce, and the amount of alimony in futuro that is ordered is not tied to the amount of alimony pendente lite. Furthermore, a trial court has broad discretion in making an award of alimony. Although there is no absolute formula for determining an award of alimony, the need of the spouse seeking support, and the obligor spouse's ability to pay are the more important factors to consider. ***Cranford v. Cranford*, 772 S .W.2d 48, 50 (Tenn.Ct.App.1989).** Fault of the obligor spouse in the termination of the marriage is also to be considered. ***Gilliam v. Gilliam*, 776 S.W.2d 81 (Tenn.Ct.App.1988).** We conclude that the trial court did not err in ordering a lower alimony in futuro payment than was awarded in alimony pendente lite. Although all parties agreed that Ms. Kyle was unable to work at the time of trial, the fact of her inability to work does not deprive the trial court of discretion in setting the amount of alimony in futuro. In view of the sizable assets that were awarded to Ms. Kyle in the division of marital property, we cannot say that the trial court abused its discretion in awarding a lower monthly alimony payment in futuro than was awarded during the pendency of the divorce action.

      **b.** **By failing to require that Husband maintain Wife as beneficiary on his life insurance policy to secure his alimony obligation?**

      **c.** **By failing to require that Husband maintain medical and dental insurance coverage for Wife as alimony in futuro?**

Ms. Kyle finally contends that the trial court erred in not requiring Mr. Kyle to maintain Ms. Kyle as a beneficiary on his life insurance policy to secure his alimony obligation, and in failing to maintain medical and dental insurance coverage for Ms. Kyle as alimony in futuro. Upon our review of the record, we conclude that the trial court erred in failing to require Mr. Kyle to secure his alimony obligation to Ms. Kyle by maintaining her as a beneficiary on a life insurance policy. We modify the trial court's order to require Mr. Kyle to maintain Ms. Kyle as a beneficiary on a life insurance policy in the amount of $150,000.

With respect to medical and dental insurance, Ms. Kyle has failed to cite us to any Tennessee law requiring that she be provided with medical and dental insurance as part of her alimony in futuro. As we noted, supra, the trial court awarded wife with sizable property in the division of marital

property, and she will receive $1,000 per month in alimony in futuro. In light of the broad discretion granted to the trial court in its award of alimony, we cannot say that the trial court abused its discretion in this instance, and we find no error in the trial court's failure to require that Ms. Kyle be maintained as a beneficiary on Mr. Kyle's life insurance policy, or its failure to require Mr. Kyle to maintain medical or dental insurance for Ms. Kyle.

*Issue 3:* **Whether the trial court erred in its award of alimony in futuro [by failing to order a date on which the alimony payments would terminate].**

*Issue 4:* **Whether the trial court erred in its award of attorney's fees to wife.**

*Issue 5:* **Whether this Honorable Court should award husband attorney's fees and costs incurred to defend this appeal.**

Mr. Kyle has raised three issues on appeal: Whether the trial court erred in failing to order a date on which his alimony in futuro payments would terminate; whether the trial court erred in awarding attorney's fees to Ms. Kyle; and whether this Court, on appeal, should award Mr. Kyle with attorney's fees and costs incurred to defend this appeal. We must answer each of these questions in the negative. By its very nature, alimony in futuro will terminate upon the death or remarriage of Ms. Kyle. In light of the broad discretion granted to the trial court in making an award of alimony and property division, we do not find that the trial court erred in failing to order a date on which alimony in futuro payments would terminate. Having reviewed the record, we cannot say that the trial court abused its discretion in awarding attorney's fees to Ms. Kyle, especially considering that Mr. Kyle is relatively advantaged financially in comparison with Ms. Kyle. Finally, we decline to award attorney's fees and costs of defending this appeal to Mr. Kyle. The award of such fees and costs would be appropriate only if we were to deem this appeal to be frivolous, which we do not.

## VI. CONCLUSION

The trial court's order is affirmed in part, reversed in part, and modified as described herein, and we remand for further proceedings consistent with this opinion. Costs in this appeal are to be divided equally between the parties, Mary Lou Climer Kyle, and her surety, and Kevin Allen Kyle.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.